UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 10-0051-4 (PLF) |
| ALONZO MARLOW, | ) ) ) | |
| Defendant. | ) ) | |

OPINION

This matter is before the Court on defendant Alonzo Marlow's <u>pro se</u> motion [Dkt. No. 593] to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, as amended by his supplemental motion [Dkt. No. 630] to vacate his conviction and order a new trial pursuant to 28 U.S.C. § 2255. The United States opposes the motion. Upon careful consideration of the parties' papers, the relevant legal authorities, and the entire record in this case, the Court will deny Mr. Marlow's motion.[1]

---

[1] The Court reviewed the following documents and accompanying exhibits in connection with the pending motion: Superseding Indictment as to Mark Pray, Kenneth Benbow, Alonzo Marlow, et al. ("Superseding Indictment") [Dkt. No. 88]; Transcript of February 6, 2012 morning trial proceedings ("Feb. 6, 2012 AM Trial Tr.") [Dkt. No. 397]; Transcript of February 6, 2012 afternoon trial proceedings ("Feb. 6, 2012 PM Trial Tr."); Transcript of February 7, 2012 morning trial proceedings ("Feb. 7, 2012 AM Trial Tr.") [Dkt. No. 398]; Transcript of February 7, 2012 afternoon trial proceedings ("Feb. 7, 2012 PM Trial Tr."); Transcript of February 16, 2012 morning trial proceedings ("Feb. 16, 2012 AM Trial Tr.") [Dkt. No. 403]; Transcript of February 21, 2012 morning trial proceedings ("Feb. 21, 2012 AM Trial Tr.") [Dkt. No. 404]; Transcript of February 22, 2012 morning trial proceedings ("Feb. 22, 2012 AM Trial Tr.") [Dkt. No. 406]; Transcript of February 23, 2012 morning trial proceedings ("Feb. 23, 2012 AM Trial Tr.") [Dkt. No. 407]; Transcript of February 27, 2012 morning trial proceedings ("Feb. 27, 2012 AM Trial Tr.") [Dkt. No. 408]; Transcript of February 28, 2012 morning trial proceedings ("Feb. 28, 2012 AM Trial Tr.") [Dkt. No. 475]; Transcript of February 28, 2012 afternoon trial proceedings ("Feb. 28, 2012 PM Trial Tr."); Transcript of March 1, 2012 morning trial proceedings ("March 1, 2012 AM Trial Tr.") [Dkt. No. 477];

I. BACKGROUND AND PROCEDURAL HISTORY

Defendant Alonzo Marlow's criminal case arises from his involvement in an interstate drug conspiracy. Mark Pray, a co-defendant of Mr. Marlow's in the instant case, was the leader of a drug distribution organization operating out of the Barry Farm public housing complex in Washington, D.C. See United States v. Danson, Criminal No. 10-0051, 2020 WL 3467887, *1 (D.D.C. June 25, 2020) (explaining that the nature of the enterprise was to "obtain as much money and things of value as possible through the trafficking of controlled substances"); see also Feb. 7, 2012 PM Trial Tr. at 4-5. As a result of his involvement with the organization, Mr. Marlow was charged with and convicted of several drug-related crimes and several violent crimes. See Verdict Form at 18-23. Among those crimes were the murders of Crystal Washington and Jheryl Hodge. See id. at 21-22. Those convictions are the subject of this motion.

### A. The Murder of Crystal Washington

Testimony offered at Mr. Marlow's trial established the connection between Crystal Washington and Mr. Marlow. For example, Assistant United States Attorney ("AUSA") Mona Sahaf testified concerning conversations she had with Crystal Washington prior to Ms.

---

Transcript of March 5, 2012 morning trial proceedings ("March 5, 2012 AM Trial Tr.") [Dkt. No. 478]; Transcript of March 21, 2012 morning trial proceedings ("March 21, 2012 AM Trial Tr."); Verdict Form as to Mark Pray, Kenneth Benbow, and Alonzo Marlow ("Verdict Form") [Dkt. No. 396]; Mr. Marlow's Notice of Appeal to D.C. Circuit ("Notice of Appeal") [Dkt. No. 463]; Transcript of June 21, 2012 Sentencing Proceedings ("Sentencing Tr.") [Dkt. No. 520]; Mr. Marlow's pro se Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255 ("Mot. to Vacate") [Dkt. No. 593]; Supplement to Defendant's Motion to Vacate ("Supp. Mot. to Vacate") [Dkt. No. 630]; United States' Opposition to Defendant's Motion to Vacate ("Gov't Opp.") [Dkt. No. 641]; letter from U.S. Attorney's Office regarding Firearms Examination Unit ("FEU Letter") [Dkt. No. 641-1]; Summary of Firearms Examination Errors ("Exam Summary") [Dkt. No. 641-2]; and Mr. Marlow's Reply to the United States' Opposition ("Reply") [Dkt. No. 689].

Washington's death. Feb. 6, 2012 PM Trial Tr. at 61. During those conversations, AUSA Sahaf learned that Mr. Pray's organization used Ms. Washington's house to prepare and package crack cocaine, marijuana, and phenylcyclohexyl piperidine (PCP). Id. at 70; Feb. 7, 2012 PM Trial Tr. at 7-9. Officer John McElhenny of the Metropolitan Police Department also testified at Mr. Marlow's trial. He stated that on September 1, 2006, he, along with two other officers, responded to a reported burglary at Ms. Washington's house. Feb. 6, 2012 AM Trial Tr. at 18-21. When they arrived, the officers found Mr. Pray, Ms. Washington, and several other members of Mr. Pray's organization, along with a "large quantity of narcotics." Id. at 30-31. The officers placed the individuals at the scene under arrest. Id. at 47.

Other testimony at Mr. Marlow's trial established Ms. Washington's role in the criminal cases against Mr. Pray and members of his organization. In particular, AUSA Courtney Saleski testified at trial that Ms. Washington ultimately entered into a plea agreement with prosecutors and testified against Mr. Pray before a grand jury. Feb. 6, 2012 PM Trial Tr. at 74-78. AUSA Saleski stated that Ms. Washington also agreed to testify against Mr. Pray at trial. Id. at 77. Mr. Pray was subsequently indicted on November 12, 2008, along with other members of his organization. Feb. 7, 2012 AM Trial. Tr. at 7. Consistent with Ms. Washington's plea agreement, she was released to a halfway house in February 2009, where she lived during the months leading up to Mr. Pray's trial. Feb. 6, 2012 PM Trial Tr. at 28-29. The trial was scheduled to begin on April 13, 2009. On April 10, 2009, Ms. Washington was shot and killed outside of her place of work. Feb. 7, 2012 PM Trial Tr. at 60.

Mr. Marlow was charged with the murder of Ms. Washington. Superseding Indictment at 39. Marvin Benton, a co-defendant in Mr. Pray's criminal case in Superior Court, testified as a cooperating witness at Mr. Marlow's trial. See Feb. 16, 2012 AM Trial Tr.

3

at 94, 121. He testified that in the spring of 2009, he learned the location of the halfway house where Ms. Washington was residing. Feb. 21, 2012 AM Trial Tr. at 11. He shared that information with Mr. Pray on March 14, 2009. Id. at 25-26. Several days later, Mr. Benton heard from his cellmate, another high-level member of Mr. Pray's organization, that Mr. Marlow planned to attend the next court hearing. Id. at 33. Mr. Benton testified that he understood that Mr. Marlow wanted to confirm Ms. Washington's identity at the hearing so that he could later kill her. Id. at 33, 56-57. On March 20, 2009, Mr. Benton saw Mr. Marlow at a hearing in Superior Court during which the prosecutor identified Ms. Washington as a trial witness for the government. Id. at 34-36. Ms. Washington was shot and killed on April 10, 2009. The day after her murder, Mr. Benton's cellmate showed him a newspaper article regarding the murder and stated that it "was [Mr. Marlow's] work." Id. at 57-58.

Other evidence supported Mr. Benton's testimony. John Defant, the vice president of hardware design at 3M Electronic Monitoring, testified about global positioning system ("GPS") data related to Mr. Marlow's case. See March 1, 2012 AM Trial Tr. at 4-6. He testified that Mr. Marlow began wearing a GPS tracking device on April 9, 2009, one day before Ms. Washington's murder. Id. at 37. He further testified that GPS data show that, on April 10, 2009, Mr. Marlow's device was stationary near Ms. Washington's workplace for more than an hour prior to her murder. Id. at 75-76. At the time of the murder, Mr. Marlow's device moved at a high speed toward the lot where the shooting took place. Id. at 83. One minute after the murder, the GPS device had traveled one block away from the scene. Id. It then traveled to the Barry Farm housing complex, reaching speeds of up to 67 miles per hour. Id. at 85. The testimony of Special Agent Scott Eicher of the FBI's Cellular Analysis and Survey Team also supported Mr. Benton's testimony. Agent Eicher stated that cell-site data from Mr. Marlow's

4

phone indicated that Mr. Marlow was in the vicinity of the crime scene at the time of the murder. March 5, 2012 AM Trial Tr. at 68-69.

Some evidence at trial did not support the prosecution. For example, Luciano Morales, a firearms examiner with the Metropolitan Police Department's Firearms Examination Branch, determined that a .40-caliber pistol recovered from Mr. Marlow's home "did not fire the cartridge casings recovered" from the scene of Ms. Washington's murder. March 14, 2012 Trial Tr. at 36. At trial, the parties stipulated to this firearms comparison.

### B. The Murder of Jheryl Hodge

On July 23, 2009, Lamare Larkins, a high-level member of Mr. Pray's organization, and his step-brother were shot. Officer Bryan Kasul of the Metropolitan Police Department testified about the shooting at Mr. Marlow's trial. See Feb. 22, 2012 AM Trial Tr. at 102. He stated that Mr. Larkins survived the shooting, but his step-brother died from his injuries. Id. at 103-104. Witnesses indicated that one of the shooters was the brother of a man named Jheryl Hodge. Id. at 116-118. When Officer Kasul spoke to Mr. Larkins, however, he denied knowing the identity of his assailants. See id. at 109-110.

Mr. Marlow was incarcerated at the time of the assault on Mr. Larkins, but he was released on December 30, 2009. Feb. 28, 2012 PM Trial Tr. at 33-34. Two weeks later, on January 13, 2010, Jheryl Hodge was shot and killed. Feb. 23, 2012 AM Trial Tr. at 26. At trial, the prosecution presented evidence that Mr. Marlow was the perpetrator. Lawson White, another member of Mr. Pray's organization, testified at Mr. Marlow's trial. He stated that on the day of Mr. Hodge's murder, Mr. Marlow called Mr. White and then came over to his house and asked for a gun. Feb. 28, 2012 AM Trial. Tr. at 18-20. Mr. Marlow told Mr. White that he had seen someone at Barry Farm who "killed his man." Id. at 20. Mr. White supplied Mr. Marlow with

5

a .40-caliber Glock and drove Mr. Marlow to the alley where the murder took place.  Id. at 21-23.  Mr. White testified that Mr. Marlow exited the vehicle and walked behind a dumpster, while Mr. White stayed in the car.  Id. at 26.  When Mr. Marlow returned to the car, he told Mr. White that he "just crushed this dude" and instructed Mr. White to dispose of the gun.  Id. at 27.

Again, Mr. Defant of 3M Electronic Monitoring testified regarding Mr. Marlow's GPS tracking data on the day of the murder.  March 1, 2012 AM Trial Tr. at 61-64.  He stated that Mr. Marlow's device was recorded moving toward the alley and dumpster where Mr. Hodge was killed, at the time he was killed.  See id. at 63.  One minute later, his device was recorded moving in the opposite direction, back to the point where it had started from.  Id. at 64-65.  Cell-site data, testified to by FBI Special Agent Catherine Hanna, corroborate the GPS data.  See March 5, 2012 AM Trial Tr. at 46-49.

Officer Thomas Coughlin of the Metropolitan Police Department's crime scene search unit was among those who responded to the scene of the Hodge murder.  Feb. 27, 2012 AM Trial Tr. at 7-9.  At trial, he testified that officers recovered fourteen ammunition casings from the scene.  Id. at 14-15.  The parties stipulated that Daniel Barrett, a firearms examiner with the Metropolitan Police Department's Firearms Examination Branch ("FEB"), determined that the fourteen casings had all been fired from the same .40-caliber firearm.  See Feb. 28, 2012 PM Trial Tr. at 35-36 (reading Government Exhibit 2031, Stipulation of Testimony Regarding Firearms Comparisons, into the record).  A civilian crime scene technician, Shannon Gill, also testified at trial.  See id. at 54.  She stated that eleven days after the Hodge murder, on January 24, 2010, officers recovered twenty-two ammunition casings from Mr. White's house, where he often fired test rounds.  Id. at 61-64.  The parties stipulated that the FEB determined that six casings from Mr. White's house had been fired from the same .40-caliber firearm that

fired the fourteen casings from the scene of the Hodge murder. Id. at 36-37. Finally, the parties stipulated that Mr. Barrett determined that a .40-caliber Smith and Wesson found in Mr. White's house did not fire any of the matching .40-caliber casings. Id.

In his closing argument at trial, counsel for Mr. Marlow relied on the firearms stipulations to argue that Mr. White was a stronger suspect for the murder of Mr. Hodge. See March 21, 2012 AM Trial Tr. at 128-30. He pointed out that the firearms evidence linked Mr. White to the gun used to kill Mr. Hodge. Id. at 129 (telling the jury "January 24th, 2010, that same gun [used] in . . . the Hodge murder is in the hands again of Lonnie White. And you have the stipulation"). Based on the stipulated-to firearms evidence, Mr. Marlow suggested that Mr. White was the perpetrator of the Hodge murder.

*C. Direct Appeal*

On April 3, 2012, after an eight-week jury trial before Judge Rosemary Collyer, who presided over this case prior to her retirement, Mr. Marlow was convicted of the murders of Ms. Washington and Mr. Hodge, along with various drug-related crimes. See Verdict Form at 18-24. Judge Collyer sentenced Mr. Marlow to two counts of life imprisonment without parole for the murders. Sentencing Tr. at 27. Mr. Marlow timely appealed his conviction to the United States Court of Appeals for the District of Columbia Circuit, see Notice of Appeal, and the court of appeals affirmed Mr. Marlow's murder convictions, United States v. Benbow, 709 F. App'x 25, 29 (D.C. Cir. 2018). The court stated that "ample evidence showed . . . that Marlow murdered Hodge to avenge the murder of a member of Pray's organization." Id. at 27. It further stated that, "[a]s to the convictions related to Washington's murder . . . : Those charges were overwhelmingly proved by cooperating witness testimony corroborated by physical evidence . . . ." Id. at 28.

7

*D. Firearms Examination Errors*

On December 7, 2016, Daniel Barrett, one of the firearms examiners involved in Mr. Marlow's case, undertook a routine proficiency examination and erred in one firearms comparison. FEU Letter at 1. As a result of that error, the D.C. Department of Forensic Sciences ("DFS") "suspended Firearms Examiner Barrett from casework and undertook a review of [a portion of] Mr. Barrett's cases since his last successful proficiency examination in August 2015." Id. at 2. A review of nineteen cases revealed that Mr. Barrett had erred in a 2016 case involving the same type of weapon and ammunition as had been used in the murder of Mr. Hodge. Specifically, Mr. Barrett had identified ten .40-caliber cartridge cases as all having been fired from the same Glock-style pistol. Re-examination by another firearms examiner, however, revealed that four of the cartridge cases were fired from one Glock-style pistol, while six of the cartridge cases were fired from a different Glock-style pistol. See Exam Summary at 1. Mr. Barrett's erroneous comparison had been verified by Luciano Morales, another firearms examiner who had conducted firearms comparisons in Mr. Marlow's case. See id.

The United States Attorney's Office sent a letter to the D.C. Public Defender Service, the Federal Public Defender, and the Criminal Justice Act Panel, notifying them of the error. See FEU Letter. The letter stated that Mr. Morales was no longer employed by DFS and that DFS would no longer be sponsoring Mr. Barrett as an expert witness. Id. at 1. It further stated that DFS was undertaking a complete review of all cases worked by Mr. Barrett since his last successful proficiency test in 2015, as well as past cases worked by Mr. Morales. Id. at 2. The comprehensive review ultimately revealed two additional errors committed by Mr. Barrett – one in a 2015 case and one in a 2016 case. See Exam Summary at 3. The reports that contained the errors were all issued in 2016. See id. at 1, 3, 6.

## II. LEGAL STANDARD

### A. Section 2255

A federal prisoner may move to vacate, set aside, or correct a sentence if he believes that the sentence was imposed "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. "The circumstances under which such a motion will be granted, however, are limited in light of the premium placed on the finality of judgments and the opportunities prisoners have to raise most of their objections during trial or on direct appeal." United States v. Clark, 382 F. Supp. 3d 1, 19-20 (D.D.C. 2019) (quoting United States v. Henry, 821 F. Supp. 2d 249, 253 (D.D.C. 2011)). To obtain relief under Section 2255, a prisoner must "clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982). "The burden of proof is on the petitioner to demonstrate his right to relief under § 2255 by a preponderance of the evidence." United States v. Tanguay, No. 08-CR-271-RCL-5, 2020 WL 2735589, at *2 (D.D.C. May 26, 2020). "If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." United States v. Henry, 821 F. Supp. 2d at 253 (quoting Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 4(b)).

### B. Rule 33

Although there is substantial overlap with Section 2255, "Rule 33 is clearly a step in the criminal proceeding, while Section 2255 is 'arguably an independent civil action.'" United States v. Clark, 382 F. Supp. 3d at 19 (quoting 3 CHARLES A. WRIGHT & SARAH N.

WELLING, FED. PRAC. & PROC. CRIM. § 591 (4th ed. 2011)). Originally, it "was not [Rule 33's] purpose to meet the problems involved in habeas corpus proceedings or a collateral attack upon a judgment." Id. (quoting Duggins v. United States, 240 F.2d 479, 483 (6th Cir. 1957)). Those proceedings are most appropriately brought under Section 2255. See id.

Generally, "Rule 33 deals with contentions that evidence discovered after trial shows that the accused is innocent." United States v. Rollins, 607 F.3d 500, 504 (7th Cir. 2010). To support a motion under Rule 33 based on newly discovered evidence, a defendant must satisfy five requirements:

> (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) [it must be] of such nature that in a new trial it would probably produce an acquittal.

United States v. Johnson, 519 F.3d 478, 487 (D.C. Cir. 2008) (quoting United States v. Lafayette, 983 F.2d 1102, 1105 (D.C. Cir. 1993)). "Any motion for a new trial grounded on newly discovered evidence must be filed within three years after the verdict or finding of guilty." FED. R. CRIM. P. 33(b)(1).

### C. Construing the Motion

The issue of whether a motion should be construed as arising under Section 2255 or Rule 33 arises regularly. Generally, courts are "not bound by a pro se litigant's characterization of his cause of action." Williams v. Gonzales, 567 F. Supp. 2d 148, 149 (D.D.C. 2008). Instead, "[f]ederal courts sometimes will ignore the legal label that a pro se litigant attaches to a motion and recharacterize the motion in order to place it within a different legal category." Castro v. United States, 540 U.S. 375, 381 (2003) (collecting cases). Courts "may do so in order to avoid an unnecessary dismissal, to avoid inappropriately stringent

application of formal labeling requirements, or to create a better correspondence between the substance of a pro se motion's claim and its underlying legal basis." Id. at 381-82 (citations omitted).

A court "must determine the proper characterization of a filing by the nature of the relief sought." Williams v. Gonzales, 567 F. Supp. 2d at 149. Ultimately, "any motion filed in the district court that imposed the sentence, and substantively within the scope of § 2255 [ ], *is* a motion under § 2255." United States v. Clark, 977 F.3d 1283, 1289 (D.C. Cir. 2020) (quoting Trenkler v. United States, 536 F.3d 85, 97 (1st Cir. 2008)). Courts thus tend to give petitioners, particularly pro se petitioners, "the benefit of the doubt." United States v. Clark, 977 F.3d at 1289.

### III. DISCUSSION

Mr. Marlow filed a pro se Section 2255 motion in September 2018. See Mot. to Vacate. The Court subsequently appointed counsel to represent Mr. Marlow in these proceedings. On November 22, 2019, Mr. Marlow, through counsel, filed a supplemental motion to vacate. See Supp. Mot. to Vacate. The parties disagree about whether the motion to vacate is more properly construed as arising under Section 2255 or Rule 33. See Gov't Opp. at 18; Mot. to Vacate; Supp. Mot. to Vacate. Indeed, Mr. Marlow himself seems uncertain about which standard should govern. He fashions his pro se filing as a Section 2255 motion. See Mot. to Vacate at 1. His supplemental motion, filed by counsel, is likewise labeled as a 2255 motion, see Supp. Mot. to Vacate at 1, but it cites to Rule 33 and discusses three of the five requirements for a new trial under that rule, see id. at 3. Finally, in his reply, Mr. Marlow states that he "is not making a specific Rule 33 claim," but then he goes on to concede that because "we have newly

11

discovered information, [sic] that impacts evidentiary concerns . . . it seems appropriate to view the issues through the prism of Rule 33 jurisprudence." Reply at 3.

Ultimately, the Court need not resolve the question of whether Mr. Marlow's motion is more properly construed as a Section 2255 or Rule 33 motion because under either provision, Mr. Marlow's motion must be denied.

*A. Section 2255*

Assuming Mr. Marlow accurately characterizes this motion as arising under 28 U.S.C. § 2255, the motion must be denied. Mr. Marlow's briefing can be read as raising two constitutional issues: a Brady violation and a violation of his Sixth Amendment confrontation rights. Each claim fails on the merits.

1. Brady v. Maryland

Mr. Marlow argues that the prosecutors in his case failed to carry out their "fundamental exculpatory discovery obligation" by not disclosing information that would have called into question the testimony of the two firearms experts. See Supp. Mot. to Vacate at 3; Reply at 3 (citing Brady v. Maryland, 373 U.S. 83 (1963)). To prevail on a Brady claim, the movant must satisfy three requirements: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the [government], either willfully or inadvertently; and [3] prejudice must have ensued." United States v. Flynn, 411 F. Supp. 3d 15, 26 (D.D.C. 2019)). "To satisfy the prejudice component, the defendant must show that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" United States v. Sitzmann, 893 F.3d 811, 826 (D.C. Cir. 2018) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).

First, Mr. Marlow has pointed to no case law – and this Court can find none – establishing that the prosecution has a duty to disclose evidence that does not exist at the time of trial. Even assuming such a requirement could be imposed on the prosecution, however, Mr. Marlow has failed to show prejudice as to the murder of Mr. Hodge. Mr. Marlow states that he did not present a third party perpetrator defense at trial, "in large part [because of] forensic testing with respect to specific firearms/calibers." Supp. Mot. to Vacate at 2. Specifically, he states that "the expert testimony provided by [Mr. Barrett] effectively excluded a credible suspect, [Mr. White], from a crime scene," thus preventing Mr. Marlow from arguing that Mr. White was the perpetrator of the Hodge murder. Id. at 3. But Mr. Marlow did present a third party perpetrator defense at trial, and he used the firearms stipulations to do so. See March 21, 2012 AM Trial Tr. at 128-30 (arguing that Mr. White was more likely than Mr. Marlow to be the perpetrator because the stipulations linked Mr. White to the gun used to kill Mr. Hodge). Thus, even if Mr. Marlow had been made aware of any hypothetical issues with the firearms evidence, he would have been forced to choose between one strategy – using the firearms examinations to support a third party perpetrator defense – and a second strategy – calling into question the firearms examinations. Mr. Marlow has not shown that the second strategy would have produced a different result in his trial. This is particularly true in light of the fact that the Mr. Marlow's conviction for the Hodge murder is supported by an abundance of GPS data, cell-site data, and eyewitness testimony.

In addition, Mr. Marlow does not explain how evidence of the firearms examiners' errors would have led to a different result with respect to the murder of Ms. Washington, and the Court fails to see how he could make such an argument. The parties stipulated to the fact that a gun found at Mr. Marlow's residence did not fire the casings in the

Washington murder.  See March 14, 2012 Trial Tr. at 36.  This stipulation supported Mr. Marlow's defense at trial, rather than undermining it.  It is possible that Mr. Marlow could have devised a different trial strategy if he had somehow known that the firearms examiners would err years after his trial, though he fails to explain what that strategy would have been.  In any event, Mr. Marlow has not established a reasonable probability that the outcome of his trial would have been different had he been apprised of the potential for errors in future firearms examinations.  This conclusion is bolstered by other compelling evidence against him.  He has therefore failed to show prejudice as to the murder of Ms. Washington.

### 2.  Sixth Amendment

Mr. Marlow does not allege a Sixth Amendment violation in either his pro se motion or his supplemental motion.  See generally Mot. to Vacate; Supp. Mot. to Vacate.  Instead, he simply argues that the "the ability to [cast] doubt upon the testimony of the two forensic experts had the potential to make a crucial difference to the jury's assessment of the evidence as a whole."  Supp. Mot. to Vacate at 3.  Only in his reply brief does Mr. Marlow finally clarify that a Sixth Amendment argument is "at the heart of his Motion."  Reply at 2.  Arguments made for the first time in reply briefs are generally considered waived.  See United States v. Ford, 183 F. Supp. 3d 22, 38 (D.D.C. 2016) (citing In re Asemani, 455 F.3d 296, 300 (D.C. Cir. 2006)).  The Court nevertheless will address the Sixth Amendment confrontation argument on its merits.

Mr. Marlow argues that his confrontation rights were violated by his inability to effectively cross-examine the two firearms examiners identified in the FEU Letter.  Reply at 2.  The Sixth Amendment guarantees the right to effective cross-examination.  See Davis v. Alaska, 415 U.S. 308, 318 (1974).  This includes the ability to call into question the reliability and

expertise of a witness. See, e.g., Delaware v. Van Arsdall, 475 U.S. 673, 680, (1986) ("We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination [that would] . . . 'expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'").

Mr. Marlow has not shown that he was denied the opportunity to effectively cross-examine the firearms examiners at trial. As an initial matter, those firearms examiners did not testify at trial because the parties stipulated to the firearms evidence. See Feb. 28, 2012 PM Trial Tr. at 34 (reading out stipulation of testimony concerning firearms comparisons). In other words, the defense agreed to forgo cross-examination of the firearms examiners. More to the point, the evidence that has only recently come to light concerning Mr. Barrett and Mr. Morales simply did not exist at the time of Mr. Marlow's trial. Even now, there exists no evidence that the firearms examiners erred in Mr. Marlow's case or in any other case prior to 2015. See FEU Letter at 3. Mr. Marlow cites no cases holding that a Sixth Amendment violation arises when evidence is later discovered that did not exist at the time of trial and does not directly bear on the defendant's case, and the Court has found no such cases. Mr. Marlow has failed to establish a violation of his Sixth Amendment confrontation rights.[2]

---

[2] The Court notes that the issues surrounding the D.C. Department of Forensic Sciences ("DFS") and its Firearms Examination Unit ("FEU"), including its recent loss of accreditation, are very serious. For two reasons, however, these issues do not affect the Court's conclusions here. First, the firearms examinations in Mr. Marlow's case were conducted by employees of the Metropolitan Police Department's Firearms Examination Branch ("FEB"), not by employees of the FEU. Indeed, the FEU only became operational in October 2012, several months after Mr. Marlow's trial. See About the DFS, DC.GOV, https://dfs.dc.gov/page/about-dfs (last visited 6/14/2021). The Court recognizes that two of the firearms examiners in Mr. Marlow's case left the FEB and went on to work for the FEU. Nonetheless, there is no evidence that the FEB was suffering from the same supervision and management problems that now plague the FEU. Second, Mr. Marlow's trial occurred in 2012, and the firearms examiners'

## B. Rule 33

The United States argues that, if construed as a motion for a new trial based on newly discovered evidence, the motion should be denied as time-barred. Gov't Opp. at 19. The Court agrees. Rule 33 of the Federal Rules of Criminal Procedure clearly states that a motion for a new trial based on newly discovered evidence must be filed within three years of the verdict or guilty finding. See FED. R. CRIM. P. 33(b)(1). Neither the rule nor case law provide for any exceptions to this time bar. See generally FED. R. CRIM. P. 33; cf. Eberhart v. United States, 546 U.S. 12, 19 (2005) (characterizing Rule 33 time limitations as "claim-processing rules" that "assure relief to a party properly raising them, but do not compel the same result if the party forfeits them"). Mr. Marlow was convicted on April 3, 2012. Because Mr. Marlow did not file this motion until 2018 at the earliest, it would be time-barred if construed as a Rule 33 motion.

Even if the motion were timely filed, it would fail to satisfy at least two of the five requirements necessary to merit a new trial. See United States v. Johnson, 519 F.3d at 487. First, the newly discovered evidence is merely impeaching. Id. Mr. Marlow asserts that his confrontation rights were violated because "the scope of [the] cross-examination [of Mr. Barrett and Mr. Morales] did not include what would later come to light as fundamental errors on their part in the general area of examination of firearms and ballistics: the area in which they were qualified as expert witnesses." Reply at 2 (emphasis added). In other words, Mr. Marlow argues that if he had known of the firearms examiners' later mistakes, he would have been able to impeach their testimony or even challenge their status as experts. Notwithstanding the fact that

---

errors occurred years later, in 2015 and 2016. These errors therefore have no bearing on Mr. Marlow's case. For these reasons, and because Mr. Marlow has not produced any evidence that the FEU erred in his case, this Court concludes that the ongoing issues concerning the reliability of the work of the FEU do not affect its decision on this motion.

the firearms examiners' errors were not discovered until years after Mr. Marlow's trial, and were unrelated to his case, evidence that is merely impeaching does not merit a new trial. Moreover, for the same reasons that Mr. Marlow cannot show prejudice to establish a Brady violation, see Section IV(A)(1), supra, he has not shown that the evidence is of "such nature that in a new trial it would probably produce an acquittal," United States v. Johnson, 519 F.3d at 487.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Mr. Marlow's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. An Order consistent with this Opinion will issue this same day.

SO ORDERED.

/s/
PAUL L. FRIEDMAN
United States District Judge

DATE: July 8, 2021